UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| JIMMY J. GILLEY AND PATRICIA GILLEY | * | CIVIL ACTION NO. 3:14-CV-00667 |
| | * | |
| | * | JUDGE ROBERT G. JAMES |
| VERSUS | * | |
| | * | MAG. JUDGE KAREN L. HAYES |
| | * | |
| LOWE'S HOME CENTERS, L.L.C. | * | JURY TRIAL |

*****************************************************************

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Jimmy Gilley was injured at a Lowe's store as he attempted to sit on a patio stool that "slid" out from underneath him. Gilley admitted that the stool was neither broken nor unstable before he tried to sit on it. Instead, he solely alleges that Lowe's was negligent because the patio stool did not have "rubber pads" on the bottom of its legs, which caused the stool to be "slippery" when placed on the store's concrete floors. There are no allegations that the stool or the concrete floors were improperly designed, constructed, assembled, inspected, or maintained. In addition, he has not produced any evidence that Lowe's knew or should have known that the stool was somehow dangerous or that the metal-to-concrete combination presented an unreasonable risk of harm. Accordingly, Lowe's respectfully requests that this Court grant its Motion for Summary Judgment on the grounds that Gilley cannot meet his burden of proof at trial under Louisiana law.

## FACTUAL BACKGROUND

On March 13, 2013, Jimmy Gilley went to the Lowe's store in Ruston, Louisiana to purchase a patio door.[1] He arrived at the store around 6:00 p.m. with his wife and two friends.[2]

---

[1] Deposition of Jimmy Gilley at page 31, lines 5-10, attached hereto as Exhibit 1.

After entering through the Garden Center, he walked through the store towards the millworks department, where the patio doors were sold. But, before he reached the millworks department, Gilley testified that a patio set on display in the seasonal area "caught [his] eye."[3] The patio set consisted of a table and four chair-stools. Gilley testified that the stools were made out of wood and had a circular swivel seat top.[4] After noticing it, Gilley took a detour from his route to look at the set, describing it as "beautiful."[5]

> Q. Describe for me the patio furniture that you sat in. What did it look like?
>
> A. They were stools a little bit higher than normal and had a table, four chairs, and I said, "That would make beautiful to put on the patio by the pool."
>
> Q. What made it beautiful?
>
> A. The design of it.[6]

Gilley further described about how the patio stools "sat higher" than other typical chairs.

> Q. Earlier you testified that the chairs sat a little higher than I think you said - -
>
> A. Normal.
>
> Q. - - normal? What does that mean?
>
> A. Well, you got most of them are probably 30 inches high. This was probably 40 inches if I had - - I didn't take time to measure it.
>
> Q. Right.
>
> A. But it was like higher than a normal stool.
>
> Q. Did you see that it was higher than a normal stool as you were walking up to it?

---

[2] Gilley's deposition at page 32, lines 19-20.
[3] Gilley's deposition at page 36, lines 14-15.
[4] Gilley's deposition at page 46, lines 8-12 and at page 107, lines 22-22.
[5] Gilley's deposition at page 35, lines 18-19 and line 23 – page 36, line 1.
[6] Gilley's deposition at page 36, lines 2-9.

  A. Yes, that's what caught my eye.[7]

Because he was interested in purchasing the set, Gilley thoroughly inspected it. When he first walked up to it, Gilley admitted that there was nothing visually wrong with the set's stools.

  Q. As you walked up to the stool, did you see anything broken about it?

  A. I didn't make any - - to my ability, no.

  Q. Did you see anything structurally unsound about the stool that you were about to sit on?

  A. No...[8]

Gilley also testified that there was nothing wrong with the concrete floor beneath the patio set.

  Q. Was it wet underneath the stool?

  A. No.

  Q. Did you have any problems walking on the concrete as you walked to the patio stool?

  A. No.

  Q. When you walked up, did you see anything wrong with the concrete floor?

  A. No.[9]

Before he tried to sit on the stool, Gilley testified that he moved the stool by swiveling its seat. As he moved the stool, he admitted that there was no indication that it was broken or unstable.

  Q. While you're standing over the stool from a short distance, enough to be able to swivel it, did you see anything broken about the stool?

  A. No, sir.

---

[7] Gilley's deposition at page 44, lines 7-18.
[8] Gilley's deposition at page 56, lines 9-14.
[9] Gilley's deposition at page 57, line 22 – page 58, line 4.

3

> Q. When you swiveled it and it spun around, did the stool wobble at all?
>
> A. No.
>
> Q. When you swiveled it, did it appear that it looked broken at all to you?
>
> A. No.
>
> Q. Because obviously, if you would have swiveled it and it looked broken, you wouldn't have sat in it, right?
>
> A. Correct.
>
> Q. Everything to you seemed like it was structurally sound before you sat in it?
>
> A. At that time, yes.[10]

After looking at and moving the stool, Gilley turned around and attempted to sit on it.[11] As he was backing up onto the stool, he testified, "it slid out from under me and I hit the ground."[12] He landed "flat on [his] back," and the stool landed behind him.[13]

Just three months before the Lowe's incident, Gilley underwent a total hip replacement surgery.[14] He was still walking with a cane on March 13, 2013.[15] Gilley was also 63 years old and weighed close to 300 pounds.[16] Since the patio stool "sat higher" than other chairs, Gilley admittedly had to lift himself up onto the stool in order to sit down. To lift himself up, he testified that he had to stand on his toes and push up on his walking cane for leverage.[17]

> Q. Okay. You also stated that it was a little higher, so you kind of had to, like maybe, go on your toes to get on it?
>
> A. I got up, just tried to get up - -

---

[10] Gilley's deposition at page 146, line 15 – page 147, line 6.
[11] Gilley's deposition at page 56, line 24 – page 57, line 1.
[12] Gilley's deposition at page 31, lines 2-3.
[13] Gilley's deposition at page 60, line 8.
[14] Gilley's deposition at page 39, lines 13-16.
[15] Gilley's deposition at page 38, lines 20-21.
[16] Gilley's deposition at page 9, line 19 and at page 128, lines 17-24.
[17] Gilley's deposition at page 108, lines 11-13.

4

> Q. Did you have to get on your toes to get up on it?
>
> A. Definitely.
>
> Q. Okay. Now, you said that you were using a cane at that time. Did you use the cane to help you - -
>
> A. A little bit?
>
> Q. Okay. So you used the cane to help elevate yourself - -
>
> A. Yes, ma'am.[18]

As he was backing up to sit on the stool, also standing on his toes and using his walking stick for leverage, the stool "slid" beneath him.

> Well, [the patio chair stool] was a little higher than normal, whatever normal is, and I just was trying to get on it and it slipped out from under me. It left. *I was about halfway on it and it left.*[19]

Shortly after Gilley's fall, Lowe's Assistant Store Manager Ramairo Jones ("Jones") arrived at the scene. When he arrived, Jones testified that Gilley was on the floor in a seated position less than one-foot away from a patio chair.[20] Jones then helped Gilley into another chair and completed an Incident Report. In his Incident Report, Jones noted the patio set's item number, manufacturer name, and product description of the chair that Gilley was less than one-foot away from when he first arrived.[21] When Gilley was questioned in his deposition with manufacturer photographs corresponding to that item number from the Incident Report, Gilley denied that the patio chair depicted in the photographs was the same patio stool involved in his incident. His memory of his patio stool differed because it was made out of wood, had no seat backing, and was taller.[22] For purposes of this summary judgment only, Lowe's accepts Gilley's

---

[18] Gilley's deposition at page 108, lines 2-13.
[19] Gilley's deposition at page 58, lines 22-25. (emphasis added).
[20] Deposition of Ramairo Jones at page 47, lines 13-21, attached hereto as Exhibit 2.
[21] Jones' deposition at page 51, line 22 – page 53, line 7.
[22] Gilley's deposition at page 49, line 21 – page 50, line 25.

5

testimony as true – that his incident involved a wooden, circular, swivel patio stool and not the patio chair depicted in the photographs and the Lowe's Incident Report. Even accepting this testimony as true, Gilley still has no evidence to meet his burden at trial against Lowe's.

There is no evidence that the patio stool was dangerous or defective. It was not broken or unstable before or after Gilley tried to sit on it. In fact, Gilley admitted:

> Q. *And as far as in your opinion, was there anything defective or wrong about the stool?*
>
> A. *No, ma'am.*[23]

There are no allegations that the stool was improperly designed, constructed, assembled, inspected, or maintained. Instead, Gilley solely alleges that Lowe's was negligent for this incident because the stool did not have "rubber pads" on the bottom of its legs, which caused the stool to be "slippery" when placed on the store's concrete floors.[24] Gilley has failed to produce any evidence, other than his own self-serving testimony, that this metal-to-concrete combination of the stool with the store's concrete floors somehow made the stool dangerous or defective.

Even assuming that Gilley's wild allegations and unfounded speculation persuades this Court to find that the stool was dangerous or defective, there is no evidence that Lowe's knew or should have known about it before Gilley's incident. Jones testified that there were no prior reports, complaints, or instances about any of the patio sets in the seasonal area, despite "several" customers and employees that sitting in that area "everyday."

> Q. Have you seen people sit in the patio set that Mr. Gilley allegedly fell from?
>
> A. Yes.
>
> Q. And out of - - and how often in a day do you see people sit in those patio sets?

---

[23] Gilley's deposition at page 153, lines 14-16.
[24] See Gilley's Petition for Damages, attached hereto as Exhibit 3.

6

> A. Several, too many to count.
>
> Q. Every day?
>
> A. Yes.
>
> Q. And so out of all that time from January to March 30, 2013, with all those people, there were never any prior complaints with that patio set or with those chairs?
>
> A. Correct.[25]
>
> . . .
>
> Q. While you were there, had you had any other incidences like this one?
>
> A. No.
>
> Q. At any other Lowe's, had you ever had someone where the chair had just completely slipped out from under them?
>
> A. No.[26]

Since there is no evidence that the stool was dangerous or defective or that Lowe's knew or should have known about this purported unreasonable harm, Lowe's respectfully requests that this Honorable Court grant its Motion for Summary Judgment, dismissing plaintiffs' claims with prejudice.

## LAW AND ARGUMENT

Gilley's Petition for Damages alleges that Lowe's was negligent because the stool did not have "rubber pads" on the bottom of its legs, which caused the stool to be "slippery" when placed on the store's concrete floors.[27] Under either general negligence principles or the Louisiana Products Liability Act, Gilley cannot meet his burden of proof at trial because there is

---

[25] Jones' deposition at page 49, line 20 – page 50, line 7.
[26] Jones' deposition at page 17, lines 11-17.
[27] See Gilley's Petition for Damages.

7

no evidence that the patio stool was dangerous or defective *or* that Lowe's knew or should have known about an unreasonable risk of harm before Gilley's incident.

I.    **Lowe's is entitled to summary judgment because the patio stool was neither dangerous nor defective under Louisiana law.**

Under general negligence principles, a plaintiff must show a defect that presented an unreasonable risk of harm to others. If plaintiff cannot present sufficient evidence of a defect, summary judgment is mandated under Louisiana law. For instance, in <u>Smith v. Casino New Orleans Casino</u>, Smith fell as he attempted to sit on a swivel chair in front of a slot machine.[28] Smith admitted that the swivel chair was neither broken nor unstable.[29] But he alleged that the casino was negligent because most of the other chairs in the casino were fixed, non-swivel chairs and the presence of a swivel chair among them created a "trap."[30] Mr. Smith "[relied] on all chairs being fixed and was unaware swivel chairs were mixed in the seating area."[31] The Fourth Circuit held that Smith did not meet an "essential element" of his claim – "that the swivel chair was either dangerous or defective."[32] The court held that "Mr. Smith's conclusory and speculative allegations set forth in his affidavit regarding the swivel chair are insufficient to satisfy his burden of proof under La. C.C.P. art. 966(C)(2)."[33] Accordingly, the Fourth Circuit affirmed the trial court's decision granting summary judgment in favor of the casino.[34]

Here, Gilley is unable to meet his burden to show that the stool was dangerous or defective. Gilley thoroughly inspected and moved the stool before he attempted to sit on it, testifying that it was not broken or unstable. *He further admitted that there was nothing*

---

[28] <u>Smith v. Casino New Orleans Casino</u>, 101 So. 3d 507, 508 (La. App. 4th Cir. 2012).
[29] <u>Id.</u>, at 513.
[30] <u>Id.</u>, at 512.
[31] <u>Id.</u>, at 509.
[32] <u>Id.</u>, at 511-12.
[33] <u>Id.</u>, at 513.
[34] <u>Id.</u>, at 514.

8

*"defective or wrong" about the stool.*[35] Gilley has failed to identify any specific defect in its design, construction, assembly, inspection, or maintenance of the stool, other than alleging that the stool should have had rubber pads on its legs. Like the swivel-to-non-swivel combination in *Smith*, Gilley's allegations about the rubber pads and the metal-to-concrete combination are pure speculation. And, as recognized by the Fourth Circuit, conclusory and speculative allegations set are insufficient to satisfy a plaintiff's burden of proof under La. C.C.P. art. 966(C)(2). Accordingly, Lowe's is entitled to summary judgment.

**II.   Alternatively, there is no evidence that Lowe's knew or should have known about an unreasonable risk of harm in the patio stool. Accordingly, Lowe's is entitled to summary judgment under either general negligence principles or the Louisiana Products Liability Act.**

Louisiana jurisprudence is replete with cases addressing the requisite knowledge of a defect in a chair by an owner, merchant, and non-manufacturer seller.[36] Regardless of Gilley's theory of recovery, Lowe's is entitled to summary judgment because Gilley cannot show that Lowe's knew or should have known of a defect in the patio stool or that the metal-to-concrete combination of the stool with the store's concrete floors was unreasonably dangerous.

Courts have granted summary judgment in favor of retail stores, in their capacity as non-manufacturer seller, because there was no evidence that the store knew or should have known about the purported defect in the chair. In *Jackson v. Sears Authorized Retail Dealer Store*, Jackson was shopping at Sears when he saw a cloth fold-up chair on display.[37] When he sat on the edge of the chair, it tipped over causing him to fall to the floor.[38] The Second Circuit recognized that there was no evidence that Sears knew or should have known of the design

---

[35] Gilley's deposition at page 153, lines 14-16.
[36] See La. C.C. art. 2317.1; La. R.S. § 9:2800.6 (Louisiana Merchant Liability Statute); and La. R.S. § 9:2800.52 (Louisiana Products Liability Act).
[37] *Jackson v. Sears Authorized Retail Dealer*, 821 So. 2d 590, 519 (La. App. 2nd Cir. 2002).
[38] *Id.*

9

defect in the chair.[39] Sears' managers testified that its store sold more than two dozen of the chairs without any apparent incident.[40] Since Jackson was unable to prove that Sears knew or should have known about the design defect, the Second Circuit dismissed his claims, citing "Jackson will be unable to satisfy his evidentiary burden of showing that Sears owed him a duty to disclose the alleged defect or have its employees inspect or test the chair for this type of design flaw."[41]

Similarly, in <u>Lewis v. Albertson's Inc.</u>, Lewis felt faint while shopping in an Albertson's store so she sat down in a lawn chair on display.[42] The chair was unable to support her weight and collapsed beneath her.[43] The Second Circuit held that there was no evidence to show that Albertson's knew or should have known about the design defect in the lawn chair under the LPLA.[44] The store's assistant manager testified that the chair was in good condition and that the store never had any problems with other chairs of the same type. In addition, the assistant manager testified that he saw other employees sit in the chair before Lewis without any problems.[45] The Second Circuit affirmed summary judgment, reasoning that "[n]o other evidence was presented that supported the Lewises' assertion that Albertson's knew or should have known of the alleged defect."[46]

Courts have also granted summary judgment in favor of owners/merchants in defective chair cases, when the owners/merchants had no knowledge of the purported defect. In <u>Parsons v. Sholand, LLC</u>, Parsons sat in a chair at a Shoney's Restaurant that collapsed beneath him.[47]

---

[39] <u>Id.</u>, at 594.
[40] <u>Id.</u>, at 593-94.
[41] <u>Id.</u>, at 594.
[42] <u>Lewis v. Albertson's, Inc.</u>, 935 So. 2d 771, 772 (La. App. 2nd Cir. 2006).
[43] <u>Id.</u>
[44] <u>Id.</u>, at 774.
[45] <u>Id.</u>
[46] <u>Id.</u>
[47] <u>Parsons v. Sholand, LLC</u>, 2014 WL 4317786, at *1 (La. App. 1st Cir. 2014).

After inspecting the chair, he believed that it failed because of a broken weld between the chair's leg and its cross beam.[48] Parsons argued that summary judgment was inappropriate because documentation from the manufacturer mandated that the business check the chair's welds for cracks and breaks and that, if Shoney's would have conducted the mandated inspections, Shoney's would have seen the broken weld and pulled the chair from circulation.[49] The First Circuit pushed through the smoke screen and correctly recognized the differences between "what could have caused the incident"/"what else could the restaurant had done" versus what Parsons could actually prove at trial about Shoney's knowledge:

> The instructions, at the most, establish the possibility that a cracked or broken weld on the chair used by Mr. Parsons [the man] might have been apparent, but it falls short of establishing that Mr. Parsons met his burden of showing sufficient evidence that a broken or cracked weld on the chair was apparent.[50]

In *Thompson v. Nelon's Fast Foods, Inc.*, the Second Circuit affirmed the trial court's judgment granting summary judgment in a case where a wooden restaurant chair collapsed under a woman while she was eating lunch.[51] After Thompson placed her food order, she pulled the chair out from the table and sat in it. She testified that, before it ultimately broke, she did not notice anything wrong with it, and there was no forewarning that it would break.[52] There was also testimony that a screw had come loose in the front part of the chair. Nevertheless, the court held that, "when she sat on the chair, [Thompson] herself noted no defect in it. The chair later gave way, but this record does not support plaintiff's contention that defendants knew or should have known of its structural problem."[53] Similarly, in *Harper v. Advantage Gaming Co.*, the Second Circuit affirmed summary judgment, holding that there was no actual knowledge of the

---

[48] *Id.*
[49] *Id.*, at *3.
[50] *Id.*
[51] *Thompson v. Nelon's Fast Foods, Inc.*, 974 So. 2d 835, 838 (La. App. 2nd Cir. 2008).
[52] *Id.*, at 837-38.
[53] *Id.*, at 838.

11

defect in the wooden bar stool used by the plaintiff or constructive knowledge of stools breaking over a period of time such that defendants should have known of a defective condition.[54]

In the instant matter, Gilley has provided no evidence that Lowe's knew or should have known that the patio stool was defective or dangerous. Gilley thoroughly looked at the stool and swiveled its seat before attempting to sit on it on the date of his incident, and he admitted that there was nothing broken, unstable, or visually wrong with the stool. Lowe's Assistant Store Manager testified that "several, too many to count" customers sat in the patio sets in the display area before Gilley. But, before Gilley's incident, Jones testified that there were no prior incidents, complaints, or problems with the stool or that type of stool. Since Gilley is unable to present any evidence that Lowe's knew or should have known about the possible danger to customers because the stool had no "rubber pads," Lowe's is entitled to summary judgment.

## CONCLUSION

Gilley alleges that Lowe's was negligent because the patio stool did not have "rubber pads" on its legs, which caused the stool to be "slippery" on Lowe's concrete floors. Lowe's is entitled to summary judgment because Gilley cannot establish that the patio stool was dangerous or defective. In addition, there is no evidence that Lowe's knew or should have known about the purported defect. To the contrary, there were no prior complaints about or incidents involving the patio sets in the front-display area, despite "several" customers and employees that sat there "everyday." Accordingly, Lowe's respectfully requests that this Honorable Court grant its Motion, dismissing Gilley's claims with prejudice.

---

[54] *Harper v. Advantage*, 880 So. 2d 948, 953 (La. App. 2nd Cir. 2004).

        Respectfully submitted:

        **TAYLOR, WELLONS, POLITZ & DUHE, APLC**

BY:   *s/D. Scott Rainwater*
        Paul J. Politz (Bar Roll No. 19741)
        D. Scott Rainwater (Bar Roll No. 30683)
        Rachel L. Kovach (Bar Roll No. 33927)
        8550 United Plaza Boulevard, Suite 101
        Baton Rouge, LA 70809
        Telephone: (225) 387-9888
        Fax: (225) 387-9886

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has this date been served on all known counsel of record in this proceeding by:

|   |   |   |   |
|---|---|---|---|
| ( ) | Hand Delivery | ( ) | Prepaid U.S. Mail |
| ( ) | Facsimile | ( ) | Federal Express |
| (X) | Electronic Mail-CM/ECF System |   |   |

Baton Rouge, Louisiana this <u>6th</u> day of March, 2015.

        *s/D. Scott Rainwater*
        TAYLOR, WELLONS, POLITZ & DUHE, APLC